IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 11, 2005 Session

## BECCA JO MARONEY v. BRANDON LEE MARONEY

**Appeal from the Fourth Circuit Court for Knox County**
**No. 85456     Bill Swann, Judge**

_____

**No. E2004-01517-COA-R3-CV - FILED AUGUST 3, 2005**

_____

Becca Jo Maroney ("Mother") and Brandon Lee Maroney ("Father") were divorced in September of 2002. The parties agreed at that time for Mother to be the primary residential parent for the parties' son. In July of 2003, Father filed a petition for change of custody claiming there had been a material change in circumstances and that it was in the best interest of the minor child for custody to be transferred to Father. After a trial, the Trial Court concluded that there had been a material change in circumstances and that designating Father as the primary residential parent was in the best interest of the minor child. Mother appeals. We hold that the evidence does not preponderate against the Trial Court's findings, and the judgment of the Trial Court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which SHARON G. LEE, J., and WILLIAM H. INMAN, SR. J., joined.

R.D. Hash, Maryville, Tennessee, for the Appellant Becca Jo Maroney.

Lori F. Fleishman, Samuel W. Brown, Knoxville, Tennessee, for the Appellee Brandon Lee Maroney.

# OPINION

## Background

Mother and Father were married in August of 1997. The parties have one child, a seven year old son. In June of 2000, Mother filed a complaint for divorce alleging that irreconcilable differences had arisen between the parties. In September of 2002, the Trial Court granted Mother a divorce based upon the stipulated ground of irreconcilable differences. The Trial Court incorporated into its final decree the terms of a marital dissolution agreement ("MDA") submitted by the parties. Pursuant to the MDA, Mother was designated as the child's primary residential parent. Father's visitation rights and child support obligation were detailed in the MDA.

In July of 2003, Father filed a Petition for Custody and To Modify. In this petition, Father claimed there had been a material change in circumstances and that it was in the best interest of the minor child for Father to be the primary residential parent. Father claimed Mother had been systematically denying his co-parenting time with the child. According to Father, Mother temporarily moved from Tennessee to Delaware and Oregon for a combined period of eight months without giving him written notice of her intent to move. Father also claimed Mother repeatedly had been cohabitating with different men to whom she was not married. Finally, Father alleged that Mother took the parties' son on a trip to Jamaica and that Mother was accompanied by a male companion on this trip. Father claimed the trip to Jamaica resulted in trauma to the child after he witnessed a violent outburst and physical altercation between Mother and her male companion.

On July 29, 2003, the Trial Court issued an injunction and transferred temporary custody of the minor child to Father. The Trial Court prohibited Mother from leaving Tennessee with the child or otherwise interfering with Father's custody.

In August of 2003, Mother responded to Father's petition to change custody and denied the existence of any material change in circumstances which would make it in the best interest of the parties' son for Father to be awarded primary residential custody. Mother then filed a petition to have Father held in contempt of court, claiming he was $1,540 behind in child support payments and that he had allowed the health insurance on the child to lapse on several occasions.

In September of 2003, an evidentiary hearing was conducted on the pending petitions with Father called as the first witness. Father testified he was 30 years old and attending Pellissippi State Technical Community College. Father had worked for three years as a truck driver for Pepsi Cola and thereafter worked for Enfia Wireless selling cellular telephones. After Father's position with Enfia Wireless was eliminated, he began his current job as a customer service representative with Eloquoy Wireless. Father denied being behind in child support payments, but acknowledged there were lapses in health insurance coverage on the parties' son when his employment with Pepsi Cola and Enfia Wireless ended. However, Father explained that his girlfriend's father operates a family medical practice in Morristown and provided any health care needed by his son during those

times when his son was not otherwise covered by health insurance. Father stated he was not aware of any outstanding medical bills for health care treatment provided to his son.

Father's primary designated co-parenting time was every other weekend. According to Father, Mother did not give him any written notification when she moved to Delaware and simply let him know by telephone of the move. Mother told him she would be working as an X-ray technician on third shift and the job was expected to last for three months. Father claimed he saw his son only two or three times during this three month period. Mother moved back to Tennessee in December of 2001 and thereafter took another temporary job assignment. This time, Mother moved to Oregon for four months and, once again, Father saw his son only on a couple of occasions during this time. Prior to Father's filing the petition for change in custody, Mother told him that she was going to move again and this time she would be selling her house in Knoxville. Father objected and informed Mother that she had to give him proper notice. According to Father, Mother told him there absolutely was nothing he could do about it because she had custody and all she was required to do was provide Father the "availability of visitation."

Father stated there were times when Mother left their son in the care of someone who was not suitable, such as a woman Mother later described as having "very bad mental issues." Father maintained there were several occasions where Mother drank excessive amounts of alcohol. According to Father, on one occasion Mother was to pick up their son early enough on a Saturday morning so that Father could go to work. Mother did not show up and later told Father that she had been binge drinking the night before and woke up in a friend's bathtub. On another occasion, Mother asked Father to watch the child and Father agreed to do so as long as Mother did not come to retrieve the child late at night. Mother nevertheless showed up around midnight banging on the door to the point the door eventually broke. By the time Father answered the door, the child was awake and upset. Mother left with the child and because it was obvious that she had been drinking alcohol, Father called the police and informed them that Mother was driving while intoxicated and that she had a minor child in her car.

Father testified that Mother currently has a family that lives with her, "a man and a woman and their 16-year old son." The child has told Father that he often sleeps in the same bed as the man and woman, who Father stated are in their early 40's. In addition, the sixteen year old has picked up the parties' son from daycare on several occasions.

Much of the hearing was devoted to Mother's trip to Jamaica. With regard to the Jamaica trip, Father testified that Mother simply informed him that she was going to Jamaica and would be taking their son with her. Father opposed Mother's taking their son because the proposed trip fell on the weekend for Father's co-parenting time. Mother nevertheless took their son to Jamaica and was accompanied by a local male attorney, Mike Shipwash ("Shipwash"), and Shipwash's daughter. According to Father, he asked his son when he returned from Jamaica if he had enjoyed the trip, and the child responded that he did. Then, about two minutes later:

[H]e said "Dad," he started crying, he said "I'm not supposed to tell you this, but it was horrible." And he went on to tell me that there was a physical altercation that took place, and that he heard lots of words that a five-year old should never hear and asked me the meaning of those words.

The words the child inquired about were "bitch" and "whore" and similar words of that nature. Father added that after returning from Jamaica, the child woke up crying on several nights saying "Michael's hurt my mom" or "my mom's hurt Mike." Father claimed his son has become very insecure and doesn't want Father to leave his sight. Father described his son as "withdrawn. He's not the same child that I knew before."

Father's girlfriend currently is attending medical school at the Medical Universities of the Americas in the British Virgin Islands. His girlfriend is in Tennessee approximately 1½ months out of the year. Father admitted there have been times when his girlfriend spent the night with him while Father exercised his co-parenting time. While Father claimed this was done in such a way that his son "never knew if she was there or not," Father nevertheless acknowledged that it was not appropriate for his girlfriend to have spent the night when his son also was present.

At the hearing both parties testified that the other was behind in child support payments. Specifically, Father claimed that after he was awarded temporary custody, Mother neither paid the full amount of her child support payments nor made them timely. Not to be outdone, Mother testified Father also was behind in child support payments and there were outstanding medical expenses which Father was responsible for paying.

Mother was the next witness and testified that for the first two years after the parties' son was born, she and Father equally split the parenting duties. After the parties separated, Mother became the primary care-giver. Mother claimed Father has not exercised co-parenting time to the fullest extent allowed.

Mother testified she moved temporarily to Oregon because she was offered a contract job earning $34 per hour, $34 a day per diem, and an additional $175 per week as a car allowance. For the first two months she was in Oregon, Mother had a female roommate who had a seven year old son and they shared in the childcare duties. Mother lived the last month in Oregon with a boyfriend and her boyfriend's male roommate. According to Mother, she would start the night out by going to sleep in the same bed as her son, then she would slip out of that bed and go sleep with her boyfriend. Mother claims she offered to purchase Father a plane ticket to Oregon so he could visit with their son, but Father did not take her up on the offer. Mother recently told Father that she was considering doing contract work again although she has no immediate plans to leave Tennessee. Mother currently owns a house in Knoxville and her godparents live with her along with their seventeen year old son. Although Mother stated her son has his own bedroom, she acknowledged that her son sleeps sometimes in the same bed with her godparents.

As to the event described by Father where he claimed to have called the police after Mother was drinking and driving with their son in the car, Mother testified that she was the one who called the police that evening and the police allowed her to leave with her son. Mother further denied that their son has nightmares about the Jamaica trip. When asked to describe the Jamaica incident, Mother began by pointing out that the bar had opened at 10:00 a.m. that day, and Mother and Shipwash took their children to a day care center and commenced drinking. Mother stated that Shipwash was drinking heavily. Later that day, Mother and Shipwash went on what Mother described as a "booze cruise." When they got back to the hotel later that day, Mother and Shipwash began arguing and he told her she was "nothing but a flirt and a slut." Shipwash made this comment in front of the children. Mother and Shipwash proceeded to argue and security was called after Shipwash put Mother "through a wall." Mother described this altercation, as "very physical" and stated she hoped that she injured Shipwash because he had verbally attacked her son. Mother claimed she paid $100 toward the $300 in damage that was done to the hotel room. After this altercation, Mother was moved to another side of the hotel under a false name. The first night they were in Jamaica, all four people were in one room, with Mother and her son sharing one bed and Shipwash and his daughter sharing the other bed. Mother admitted to other verbal outbursts between her and Shipwash and that her son was present during some of these outbursts.

Mother was asked about the incident where Father claims she failed to pick up their son on a Saturday morning because Mother had been drinking. According to Mother, twelve of her friends had taken her out the night before for a "divorce party" and the next morning she was only one hour late when arriving at Father's house. Mother denied having any sort of drinking problem.

Mother testified that she turned her mother in to the authorities for forgery and her mother later was incarcerated. When Mother's mother first got out of jail, Mother would not let her son play in her front yard out of fear that her mother or someone on her mother's behalf would harm the child.

Shipwash also testified at the hearing. According to Shipwash, he dated Mother for approximately three months. He described the relationship as "volatile" and claimed Mother had a "very bad temper and became violent several times to me and in front of her son…." Shipwash described one incident when he and Mother were arguing and Mother walked up to her son and "screamed in his face, 'See what you did. You made me lose another man.'" According to Shipwash, the "infamous" Jamaica trip was the end of their relationship. Shipwash described the Jamaica incident as follows:

> On approximately the third day of [the trip, Mother] became very intoxicated. She then attacked me, scarring my face, my legs, my arms.
>
> She went up to my daughter… who is nine years old and said, "You're a slut. Your mother's a whore." At that point after I couldn't defend myself anymore, I pushed her off against the wall.

-5-

She then slithered out in the hallway and started yelling rape. The security had to come…. If my daughter was not there, they would have never believed that [Mother] attacked me [first].

Shipwash added that Mother paid for all of the damage to the hotel room, but only after the hotel management threatened to have her arrested.

Shipwash claimed there were several occasions where Mother made derogatory comments about Father to the parties' son. Several tape recordings of phone messages or conversations between Shipwash and Mother were entered into evidence. In several of these recordings, Mother apologized to Shipwash for making a "scene" in front of Mother's son. At one point Mother stated her son "knows his mother is melodramatic … [and he] asked me why I was being so mean to you."

The Trial Court announced its ruling from the bench. In pertinent part, the Trial Court found there had been a material change in circumstances which mandated a change of custody. While the Trial Court noted that Mother was "extraordinarily able" in many respects, she also had "extraordinary boundary problems, to use the word of art." The Trial Court summarized several emotion outbursts and "traumatic" scenes the child had been exposed to while in Mother's care which the Trial Court described as a "[f]ailure to protect, a failure to put the child's needs above her own." The Trial Court further stated that Mother has continually exposed her son to her boyfriends and involved her son "in her emotional morass." The Trial Court was troubled by the fact that the child was sleeping frequently with adults and ordered Mother to provide the child with his own bed and to make sure he sleeps alone. The Trial Court then concluded that Mother's co-parenting time should be reduced. The Trial Court further stated:

The Court finds that, on several occasions, [Mother] has caused horrid emotional scenes in front of her child. She is unable to put her child's needs ahead of her own. She denigrates the father in the presence of the child. Until she has completed fifteen – I mean, successfully completed fifteen consecutive co-parenting sessions, without event and without downside, at her expense and scheduling at Parenting Place, she shall not progress to Local Rule 17 [standard co-parenting visitation].

There were numerous motions filed by the parties throughout this litigation. As pertinent to this appeal, Mother filed a motion for recusal as well as a motion to file an interlocutory appeal pursuant to Tenn. R. App. P. 9. Both of these motions were denied by the Trial Court. Father filed a motion requesting the Trial Court award him attorney fees in the amount of $19,639.61. The Trial Court granted the motion in part, awarding Father $7,000 in attorney fees and $753.36 in litigation costs.

Mother appeals raising the following issues, which we quote:

1.	Whether the Honorable Trial Judge erred in finding a material change in circumstances sufficient to warrant a change in custody.

2.	Whether the Honorable Trial Judge's findings of fact were correct, and even if correct, were the facts sufficient to warrant the harsh consequences of change of custody and the other extraordinary measures taken against [Mother].

3.	Whether the Honorable Trial Judge erred in failing to recuse himself upon Motion for Recusal.

4.	Whether the Honorable Trial Judge erred in failing to grant [Mother's] Motion for Interlocutory Appeal.

5.	Whether the Honorable [Trial Judge] erred in awarding attorney fees to [Father].

Father's issues are his claim that the Trial Court erred by not awarding him all of the requested attorney fees, as well as a claim that he is entitled to attorney fees incurred on appeal.

**Discussion**

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure de novo standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S .W.3d 706, 710 (Tenn. 2001).

We first address the Trial Court's finding that there was a material change in circumstances which would warrant a change in custody to Father. In *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), our Supreme Court set forth the appropriate standard to be applied when making such a custody determination. Specifically, the Court stated:

The principal issue in this case concerns the proper standard to be applied to a petition to modify custody from one parent to the other parent. This issue is largely resolved by our recent decision in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002). *Blair* involved a custody dispute between a parent and a non-parent. We concluded that once a valid order of custody has been issued, subsequent custody modification proceedings should apply the "standard typically applied in parent-vs-parent modification cases: that a material change

-7-

in circumstances has occurred, which makes a change in custody in the child's best interests." *Id.* at 148. As explained in *Blair*, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id.* at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id.* (citations omitted). We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being.

*Kendrick*, 90 S.W.3d at 570 (footnotes omitted).

There is no dispute that, at a minimum, Mother's various relationships have exposed the child to physical altercations and verbal outbursts. The disputed testimony centers around the frequency and degree of these outbursts and altercations, who was the aggressor, and the impact they have had on the young child. For example, Father testified that the Jamaica trip had a serious emotional impact on the child to the extent that he was waking up at night concerned that Mother and Shipwash were harming each other physically. Not surprisingly, Mother testified the child has not had any nightmares in her presence and the impact of the Jamaica trip was minimal, if not nonexistent. As is often the case, the Trial Court was required to resolve the conflict in the testimony. While the Trial Court did not make any explicit credibility determinations, it is nevertheless clear that Father's testimony was credited over that of Mother's. In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d

315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

We conclude that the evidence does not preponderate against the factual findings of the Trial Court. The facts as found by the Trial Court show in simplest terms that Mother's various relationships with men often have a clear priority over the well-being of her child. Mother has exposed the child to numerous physical altercations and/or verbal outbursts which have had a detrimental impact on the child. In addition, Mother has temporarily moved far away from Tennessee on several occasions and denied Father his co-parenting time with the child. While we will not recount each and every incident, the facts as a whole are such that we cannot conclude the evidence preponderates against the Trial Court's finding that there has been a material change in circumstances which affects the child's well-being.

If a material change in circumstances has been found, then a trial court next must determine whether custody modification is in the child's best interest utilizing the factors set forth in Tenn. Code Ann. § 36-6-106. *Kendrick*, 90 S.W.3d at 570. Tenn. Code Ann. § 36-6-106(a) requires a court to consider all relevant factors when making a best interest analysis including:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment….;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person … ;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

There is no doubt that both parents love their son and are able to provide the basic necessities such as food, clothing, etc. There are, however, other factors to consider beyond these basic necessities such as the "importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment…." Tenn. Code Ann. § 36-6-106(a)(3). We are unable to describe the child's life with Mother as stable or satisfactory, and we believe Father is better able to provide the child with continuity and a stable, satisfactory environment. In addition, there is evidence in the record which causes this Court concern over Mother's boyfriends who frequent her home or with whom Mother and the child have resided. The record also supports a finding that Father will be much more willing to facilitate a relationship between the child and Mother than Mother has been to facilitate a relationship between Father and the child. When considering these and the other relevant factors, we again conclude the evidence does not preponderate against the Trial Court's decision that it is in the best interest of the child for Father to be designated the primary residential parent.

The next issue is Mother's claim that the Trial Court erred when it refused to grant her motion for recusal. In a nutshell, Mother claims the Trial Court was biased against her. In her brief on appeal, Mother simply states that the motion for recusal was filed and denied by the Trial Court, with references to the corresponding pages in the record. Nowhere in her brief does Mother state what the alleged biases were or how these claimed biases impacted the Trial Court's decisions, etc. "[W]hether recusal is warranted is left to the discretion of the trial judge, and such decision will not be reversed absent a clear abuse of discretion on the face of the record." *Bd. of Prof'l Responsibility of the Supreme Court v. Slavin*, 145 S.W.3d 538, 546 (Tenn. 2004). Neither Mother's brief nor her counsel's oral argument convinces us that the Trial Court abused its discretion when it denied her motion to recuse.

With regard to Mother's claim that the Trial Court erred when it denied her motion seeking permission to file an interlocutory appeal pursuant to Rule 9, Tenn. R. App. P., Mother's brief on appeal suffers the same defects as mentioned above. Nowhere in the law or argument sections of Mother's brief is there any mention of this issue. We initially note that we fail to see how Mother was prejudiced by the denial of this motion given that any and all issues Mother wished to

raise in a Rule 9 petition can now be raised in her appeal pursuant to Rule 3, Tenn. R. App. P.[1] We further note that Mother could have at least tried to bypass having to obtain the Trial Court's permission to file an interlocutory appeal under Rule 9 by filing one under Rule 10. Rule 9 references a Trial Court's discretion, and again we conclude that Mother has in no way established that the Trial Court in any way abused its discretion by refusing to grant Mother's request for a Rule 9 interlocutory appeal.

The final issue regards the award to Father of attorney fees and costs in the combined amount of $7,753.36. As noted previously, Father argues this was not enough, and Mother claims it was too much. Tenn. Code Ann. § 36-5-103(c) provides as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

In July of 2004, the Trial Court conducted a hearing on Father's request for attorney fees. Following the hearing, the Trial Court entered an order stating in relevant part:

> After reviewing the pleadings and after reflecting upon the statements and argument of counsel in open Court and the record as a whole, the Court concluded that the Motion was well grounded and should be granted to the extent that … [Mother should pay to Father] seven thousand dollars ($7,000) which amount represents a portion of attorney fees expended by … [Father] from June 26, 2003 and ending April 6, 2004, in this matter and, further, should pay the sum of seven hundred fifty-three dollars and thirty-six cents ($753.36) which amount represents related litigation expenses.…

---

[1] This assumes, of course, that such issues were properly preserved for review and properly addressed in the brief. Along this line, we note that Mother complains of other rulings by the Trial Court, but these issues are not set forth in the Statement of the Issues contained in her brief. Therefore, we will consider these potential issues as waived. *See King v. King*, No. M2002-01202-COA-R3-CV, 2004 Tenn. App. LEXIS 558, at * 4 (Tenn. Ct. App. Sept. 9, 2004), *reh'g denied*, 2004 Tenn. App. LEXIS 697 (Tenn. Ct. App. Oct. 20, 2004), *no appl. perm. appeal filed,* ("We consider an issue waived where it is argued in the brief but not designated as an issue. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Accordingly, Father has waived issues not designated as such in his brief.").

While several transcripts have been provided in the record on appeal, we have not been provided a copy of the transcript from the July 2004 hearing. Without this transcript, we are unable to determine what persuaded the Trial Court to rule the way that it did. It is apparent that something from that hearing impacted the Trial Court's decision given the order states it was entered after "reflecting upon the statements and argument of counsel in open Court." Without this necessary information, we cannot effectively determine if the Trial Court's total award of $7,753.36 was too much, too little, or just right. Stated another way, we cannot hold that the Trial Court abused its discretion. The judgment awarding Father a total of $7,753.36 in attorney fees and costs is, therefore, affirmed. Exercising our discretion, we decline to award Father attorney fees incurred on this appeal.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are assessed against the Appellant, Becca Jo Maroney, and her surety.

_____
D. MICHAEL SWINEY, JUDGE